## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jillian Nordby,                                Civil No. 19-2776 (DWF/HB)

          Plaintiff,

v.                                             **MEMORANDUM**
                                               **OPINION AND ORDER**
Sherburne County,

          Defendants.

---

Jeffrey D. Schiek, Esq., and Philip G. Villaume Esq., Villaume & Schiek, counsel for Plaintiff.

Cally R. Kjellberg-Nelson, Esq., and Dyan J. Ebert, Esq., Quinlivan and Hughes, PA, counsel for Defendant.

---

## INTRODUCTION

Plaintiff Jillian Nordby ("Nordby") alleges employment discrimination in violation of the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA"). (*See generally* Doc. No. 1 ("Compl.").) This matter is before the Court on Defendant Sherburne County's ("Sherburne") Motion for Summary Judgment. (Doc. No. 24 ("Motion").) For the reasons set forth below, the Court denies Defendant's Motion.

## BACKGROUND

Nordby is a person who stutters which severely affects her ability to speak and communicate. (Doc. No. 28 ("Kjellberg-Nelson Aff") ¶ 28, Ex. AA, Doc. No. 33

("Dauer Letter") at 3; *see also id.* ¶ 2, Ex. B, Doc. No. 30 ("Nordby Dep.") at 15-16.) Her condition is lifelong with fluctuating severity based on the "time in her life, different situations, different people, and the amount of pressure she feels among other things." (Dauer Letter at 3; *see also* Nordby Dep. at 15-16.)  Phone calls, speaking with supervisors, and speaking in front of groups are particularly challenging for her.  (Dauer Letter at 3.)  Because of her stutter, it takes Nordby longer to communicate her thoughts, which causes her to experience fatigue, stress, anxiety, and frustration.  (*Id.*)  At various points in her life, Nordby has taken prescribed medication for depression and anxiety related to her stutter.  (Nordby Dep. at 19-20, 251.)

Nordby interviewed for a position as an Eligibility Specialist ("Position") at Sherburne on August 2, 2018.[1]  (Kjellberg-Nelson Aff. ¶ 4, Ex. C. ("Interview Notes"). The Position's duties included conducting in-person and phone interviews to determine Sherburne County residents' eligibility for various benefit programs.  (*Id.* ¶ 2, Ex. A , Doc. No. 29 ("Job Application") at 1; ¶ 8, Ex. G ("Job Description").)  The Job Application advised that the Position involved frequent face-to-face contact in a fast-paced environment, managing a high volume of case files, and responding to a high volume of phone calls each day.  (Job Application at 3.)

Nordby had previously worked for Chisago County in a similar position.  (*See* Job Application at 1.)  Sherburne was aware that Nordby had initially struggled to manage

---

[1]     Nordby earned an associate's degree in Human Services-Eligibility Worker and completed a 288-hour internship in the field prior to applying.  (Job Application at 1.)

her caseload at Chisago County, which prompted Chisago County to extend Nordby's

probationary period from 6-months to 9-months.[2]  (Schiek Aff. ¶ 30, Ex. AA ("Holker

Dep.") at 22-23.)  Nordby was ultimately successful at Chisago County and remained in

the position for approximately 18 months.[3]  (Nordby Dep. at 25-26.)

Based on her experience at Chisago County, Nordby claims that she informed

Sherburne during her first interview that she thought it would take her "about a year or

so" to attain a full caseload at Sherburne.  (*Id.* at 90.)  Sherburne's notes from Nordby's

first interview reflect that Nordby anticipated that "getting through the 1st [sic] year" at

Sherburne would be her greatest challenge in the new role.  (Interview Notes at 2,

Question 12.)  Nordby also asserts that during a second interview with Sherburne on

August 9, 2018, she informed Sherburne that "due to [her] speech impediment/stuttering,

it takes [her] longer to speak and process phone interviews," and that "it would take [her]

longer to do the job."[4]  (Nordby Dep. at 33-34.)  At least one person who interviewed

---

[2]     Nordby's supervisor, Lisa Holker ("Holker") stated her understanding that
Nordby's probationary period was extended because "[Nordby] wasn't where [Chisago
County] needed her to be and they were still working on some things to be able to say she
could successfully handle [the] job with a full caseload."  (Holker Dep. at 23.)  Holker
also stated her understanding that after the 3-month extension, "[Nordby] had a very
positive review and . . . passed her probation."  (*Id.*)

[3]     Nordby asserts that she left Chisago County only to pursue her "dream job" at
Sherburne, which was also her hometown.  (Nordby Dep. at 25.)

[4]     Sherburne contests that Nordby made any statement during her interviews that she
would need extra time to be trained or perform the job duties because of her stutter.  (*See*
Doc. No. 26 ("Def. Memo.") at 4.)

Nordby recalls that Nordby made a comment about needing extra time because of her stutter.  (Schiek Aff. ¶ 28, Ex. Y ("Sanders Dep.") at 24-25, 46-47.)

Sherburne hired Nordby for the Position on August 27, 2018.[5]  (Doc. No. 41 ("Schiek Aff.") ¶ 23, Ex. T ("Appt. Letter").)  Nordby signed a copy of the Job Description for her Position the same day.  (*See* Job Description.)  Sherburne asserts that it hired Nordby based on her education and experience at Chisago County.  (Holker Dep. at 40.)  Nordby's employment was subject to a 12-month probationary period during which Sherburne would monitor and assess her skills and performance.  (Appt. Letter.) The purpose of the probationary period is "to allow [an employee] time to learn their position and become proficient in it."  (Schiek Aff. ¶ 22, Ex. S at 11.)  Holker stated, "it's hard to know at six months in if somebody is able to do this job, so [Sherburne's] probation period has always been a year."  (Holker Dep. at 24.)

Nordby's Job Description did not define what constituted a full caseload, nor state that maintaining a full caseload was an essential function of the Position.[6]  (*See* Job Description.)  Upon hire, Sherburne gave Nordby a caseload of approximately 80 to 90

---

[5]     During her employment with Sherburne, Nordby also operated a spray-tanning business.  (Nordby Dep. at 27.)  Sherburne contends that this is evidence that Nordby does not have a disability.  (*See* Def. Memo. at 22; *see also* Doc. No. 42 ("Reply") at 1-2.)

[6]     According to Holker, a full caseload is approximately 115-120 cases.  (*See* Schiek Aff. ¶ 31, Ex. BB ("Larson Email").)  Sanders stated that a full caseload was anywhere between 100 and 150.  (*See* Sanders Dep. at 7-8, 28.)

cases.[7]  (Holker Dep. at 30.)  According to Holker, new hires without training typically start with 25-40 cases and work up to a full caseload by month six or seven.  (*Id.* at 29-32.)  The head of Nordby's division, MaryJo Cobb, "Cobb" stated that it could take "nine months to a year" for an employee to reach a full caseload, provided "they were making good progress all along."  (Schiek Aff. ¶ 22, Ex. S ("Cobb Dep.") at 25.) Sherburne contends that Nordby was given a larger caseload because of her experience at Chisago County.  (Holker Dep. at 30; *see also* Cobb. Dep. at 25.)  In late October 2018, Sanders informed Holker that she was concerned about Nordby's accuracy rate and reported that Nordby was feeling overwhelmed.  (*See* Kjellberg-Nelson Aff. ¶ 10, Ex. I.)

Approximately one month later, Holker provided Nordby with daily log sheets to complete.[8]  (*Id*. ¶ 11, Ex. J.)  Nordby understood that the daily logs were intended to monitor how she managed her time after Holker expressed concern about how long it took Nordby to complete interviews.  (Nordby Dep. at 51-52, 65.)  During a "training check-in" in mid-December, Holker advised Nordby that she still needed to work on "time management."[9]  (*See* Kjellberg-Nelson Aff. ¶ 12, Ex. K ("Dec. Check-In").)

---

[7]      Sherburne also assigned Nordby a Lead Worker, Sadie Sanders ("Sanders"), to review Nordby's work.  (Nordby Dep. at 47.)

[8]      Holker asserts that daily logs are often used with new hires, particularly when they have trouble meeting deadlines.  (Holker Dep. at 70-71.)

[9]      Holker informed Nordby that she still had four trainings to complete within four days and that she did not understand why Nordby had been unable to find time to complete them.  (*See* Dec. Check-In.)

Holker met with Nordby again on January 9, 2019 after Nordby informed her that she had fallen behind on her work. (*Id.* ¶ 13, Ex. L.)  Holker expressed concern and confusion over how long it was taking Nordby to complete interviews. (*Id.*)  Holker told Nordby that she would ask the Lead Workers to "catch her up," but shared her expectation that Nordby manage her caseload on her own and reminded her that it was not the first time she had needed assistance. (*Id.*)  Nordby alleges that Holker also told her that Sherburne was a "suck-it-up-buttercup" kind of county and that Nordby should just stay home if she was having a "severe stuttering day" and interviews would take her a long time to complete. (Nordby Dep. at 113, 115.)

After her meeting with Holker, Nordby emailed Human Resources stating her concern that Holker did not understand her disability. (*See* Kjellberg-Nelson Aff. ¶ 14, Ex. M "Nordby Email 1").)  Nordby wrote, "[w]hen I was hired, I made it clear that I am a person [who] stutters and it does affect how long my interviews take etc." (*Id.*)  She explained that she was unable to control her stutter and reiterated that because it takes her longer to speak, it takes her longer to do her job. (*Id.*)  Nordby expressed concern that Holker was treating the extra time she required as a performance issue and wrote, "I just don't want to be worried about my job security because of how fast I physically talk." (*Id.*)  A Human Resources representative forwarded Nordby's email to Sherburne's Human Recourses Director, Tammy Bigelow ("Bigelow"). (*See* Nordby Email 1.)  An accompanying message stated, "Tammy, I have a feeling this could be a possible ADA issue.  If you have a few minutes, can we discuss?" (*Id.*)

After receiving no response to her initial email, Nordby sent a second email to
Human Resources on January 14, 2019.  (*See* Kjellberg-Nelson Aff. ¶ 15, Ex. N
("Nordby Email 2").)  Nordby stated that she had a check-in meeting with Holker
scheduled later that day and asked that a Human Resources representative attend the
meeting with her because she now feared retaliation in addition to "continued threats and
negative comments regarding [her] disability."  (*Id.*)

Bigelow attended the January 14, 2019 meeting with Nordby.[10]  (*See* Kjellberg-
Nelson Aff. ¶ 17, Ex. P. ("Jan. 14 Mtg.").)  Holker advised Nordby that after five months,
Nordby was not meeting Sherburne's performance expectations because she lacked
knowledge of internal policies and processes, still did not have a full caseload, and her
interviews took nearly twice as long to complete than they should.[11]  (*Id.*)  Holker further
advised that she expected Nordby to keep up with her workload independently and that
failure to do so could lead to disciplinary action.  (*Id.*)  Holker also provided specific
action steps that Nordby needed to take, including submitting daily logs to Sanders each
week and meeting bi-weekly with Holker.  (*Id.*)

---

[10]    In advance of the January 14 meeting, Sanders informed Holker that she had been
able to get Nordby caught up with her work and advised that she felt Nordby should
focus on prioritizing because she was not completing her work in a timely manner.  (*See*
Kjellberg-Nelson Aff. ¶ 16, Ex. O.)

[11]    Holker provided Nordby a written summary of the meeting ("Expectations
Document") and asked Nordby to sign it.  (*See* Nordby Dep. at 139-40.)  Nordby
declined.  (*See* Jan. 14. Mtg; *see also* Nordby Dep at 139-40.)

After the meeting, Nordby met separately with Bigelow.  (*See* Schiek Aff. ¶ 7, Ex. D. ("Bigelow Dep.") at 14; *see also id.* ¶ 10, Ex. G. ("Bigelow Notes").)  Bigelow's meeting notes indicate that Nordby was concerned that Holker was retaliating against her because Nordby had reported Holker to Human Resources.[12]  (Bigelow Notes.)  The notes also reflect that Nordby shared other concerns about Holker, including that Holker continually brought up Nordby's speech.[13]  (*Id.*)  After discussing some ways to help make Nordby successful, Bigelow asked Nordby to share the name of her care-provider so that Bigelow could request information on possible accommodations.  (*Id.*)

On January 18, 2019, Holker met with Nordby because Nordby had not yet signed the Expectations Document and because Holker wanted to follow up on what they had discussed during their meeting on January 14, 2019.  (*See* Kjellberg-Nelson Aff. ¶ 19, Ex. R ("Holker Notes").)  According to Holker, Nordby was visibly upset and reported that the Expectations Document was the worst feedback she had ever received.  (*Id.*)  Holker alleges that Nordby stated, "I guess I'll ride it out until I'm fired."  (*Id.*)  Nordby denies that she said this.  (Nordby Dep. at 154; *see also* Pl. Opp. at 20.)  During

---

[12]    Bigelow assured Nordby that Holker was unaware of her report; however, Nordby was skeptical.  (*See* Bigelow Notes.)  Nordby claims that after she sent her email to Human Resources, Holker's demeanor towards her changed and maintains that Human Resources notified Holker about her report in advance of the January 14 meeting.  (*See* Pl. Opp. at 18-19; *see also* Nordby Dep. at 121-22.)

[13]    Later that day, Bigelow called Holker to follow up on Nordby's allegations.  (Schiek Aff. ¶ 8, Ex. H ("Bigelow Follow-Up").)  According to Bigelow's notes, Holker denied ever commenting on Nordby's speech.  (*Id.*)

bi-weekly meetings on January 29, February 14, and March 5, 2019[14], Nordby's supervisors noted some progress; however, they documented that Nordby continued to struggle with time management and accuracy, did not use the daily logs properly, and did not follow supervisory direction.[15]  (*See* Kjellberg-Nelson Aff. ¶¶ 21-23, 27, Exs. T, U, V, Z ("March 5th Notes").)  During the March 5 check-in, Nordby was advised that she needed to complete a number of items prior to taking planned time off.  (*See* March 5th Notes.)  Nordby did not complete the tasks prior to her leave so Sanders and Fandrick were authorized to catch her up while she was away.  (*See* Kjellberg-Nelson Aff. ¶ 29, Ex. BB.)

Also on January 18, 2019, Bigelow sent Nordby an email reminding her to provide the name of her care-provider so that Bigelow could request information on possible accommodations.  (Kjellberg-Nelson Aff. ¶ 20, Ex. S at SC1309-10.)  Nordby responded to the email with the name of her Speech Pathologist on February 14, 2019.  (*Id*. at SC1309.)  One week later, Bigelow asked Nordby to share which areas of her job were particularly challenging so that Bigelow could ask Nordby's Speech Pathologist to recommend specific accommodations in those areas.  (*Id*.)  On February 25, 2019, Nordby responded that a reduced caseload would be beneficial because, as a person who

---

[14]    On March 5th, Holker was absent so her supervisor, Lisa Larson ("Larson") filled in.  (*See* March 5th Notes; *see also* Larson Email.)

[15]    On March 5th, Nordby's caseload had been reduced to 60.  (*See* March 5th Notes.) During that meeting, a decision was made to switch Nordby's Lead Worker from Sanders to Laurann Fandrick ("Fandrick").  (*Id*.)

stutters, it takes her about twice the amount of time to speak and process information. (*Id.* at SC1308.)  She stated, "I am capable of this job[;] it just takes me longer as a person whom [sic] stutters."  (*Id.*)  Bigelow understood that Nordby was requesting a permanent reduction in her caseload.  (Bigelow Dep. at 37-38.)  Bigelow contacted Nordby's Speech Pathologist, Katie Dauer, on February 27, 2019 to seek additional information on the nature of Nordby's impairment and possible accommodations. (Kjellberg-Nelson Aff. ¶ 25, Ex. X ("Request").)

On February 14, 2019, Nordby contacted Human Resources to report her belief that Holker was treating her differently than other employees.[16]  (*See* Nordby Dep. at 157, 160-61.)  Nordby elaborated on her concerns during a meeting with a Human Resources representative, Emily Scharber ("Scharber"), on February 21, 2019.  (*See id.* at 160-61; *see also* Schiek Aff. ¶¶ 26, 27, Ex. W ("Scharber Dep.") at 14; Ex. X ("Scharber Notes").)  According to Scharber's notes from the meeting, Scharber advised Nordby that Sherburne was holding her to the same standard as others in terms of caseload and other metrics.  (*Id.*)  Scharber further advised Nordby that if she wanted to file a formal harassment complaint, she would need to provide additional information on how she was being treated differently.  (Scharber Notes.)  Scharber documented that Nordby did not intend to file a formal complaint until after meeting with a union steward. (*Id.*)  Nordby claims that Scharber's documentation is incorrect and that she clearly told

---

[16]    On February 18, 2019, Nordby stayed home from work due to anxiety caused by the "overwhelming stress."  (*See* Schiek Aff. ¶ 12, Ex. I ("Medical Note").)

Scharber that she wanted to file a formal complaint against Holker for disability

discrimination.  (*See* Nordby Dep. at 157, 160.)

Dauer responded to Bigelow's Request on March 8, 2019.  (*See generally* Dauer

Letter.)  She confirmed that Nordby is a person who stutters which substantially limits

her ability to communicate.  (*Id.*at 3.)  She stated that "stuttering does not limit what

[Nordby] can do, but because of it, accommodations are warranted."  (*Id.*)  Dauer

recommended accommodations including:  (1) a significant amount of extra time;

(2) extra support; (3) greater understanding and respect for her choice to do a job that

involves communication; (4) use of a closed office rather than a cubicle for part of the

day; and (5) education and training for co-workers regarding best communication

strategies to use with people who stutter.[17]  (*Id.* at 4.)

Bigelow emailed Dauer's recommendations to Cobb on March 14, 2019. (Schiek

Aff. ¶ 17, Ex. N ("Cobb Email").)  Bigelow indicated that Dauer's recommendation to

provide Nordby a significant amount of extra time was "not a reasonable

accommodation" and that she would inform Nordby at their next meeting.  (*Id*.)  Bigelow

also stated that she "strongly recommended" going through a process to discuss

accommodations "before action is taken," and suggested that they discuss "what is

viewed as [Nordby's] lack of effort" during a meeting the following week.  (*Id*.)  Cobb

forwarded the email to Holker and Larson, and included the note, "[t]his is going to take

---

[17]     The parties do not appear to dispute that Sherburne granted all of the
recommended accommodations except a "significant amount of extra time," in the form
of a reduced caseload.

longer than either of you would like.  Sentence in red highlighted by me.  So don't give up."[18]  (*See id*.)

During a bi-weekly check-in meeting on March 15, 2019, Holker asked Nordby for feedback on ways to help make her successful in her Position.[19]  (*See* Kjellberg-Nelson Aff. ¶ 32, Ex. EE  ("March 15th Notes").)  According to Holker's documentation from the meeting, Holker advised Nordby of the steps Sherburne had already taken and advised, "[w]e can't make you successful at this job, that's up to you, you need to tell us what you need."[20]  (*Id*.)  Holker's documentation reflects that Nordby requested "more time to get used to the reduced caseload," and that Holker affirmed the request in the short-term but indicated that Nordby would need to reach a full caseload eventually.  (*See id*.)  Holker's notes indicate that Nordby understood that the reduction was not permanent.  (*See id*.)  According to Holker, Nordby told Holker that her caseload at Chisago County was larger and that while she was currently struggling at Sherburne, she would eventually be successful.  (*See id*.)  Again, according to Holker's notes, Nordby

---

[18]    Cobb highlighted the sentence, "[d]uring the meeting next week, we can discuss what is viewed as [Nordby's] lack of effort."  (*See* Cobb Email.)

[19]    While Holker noted some improvement, she expressed continued concern with Nordby's time management and accuracy despite a reduced caseload.  (*See* March 15th Notes.)

[20]    The steps Holker cited included moving Nordby's cube, reducing her caseload, allowing her to conduct interviews in a closed office, and changing her Lead Worker. (*See* March 15th Notes.)

indicated that she felt scrutinized at Sherburne in a way that she had not at Chisago County.  (*See id.*; *see also* Nordby Dep. at 97-98.)

On March 21, 2019, Bigelow met with Nordby to discuss Dauer's recommended accommodations.[21]  (*See* Kjellberg-Nelson Aff. ¶ 33, Ex. FF ("March 21st Mtg.").)  Nordby stated that additional time to complete her work would be the most helpful accommodation.  (*See* Nordby Dep. at 217, 220; *see also* March 21st Mtg.)  Bigelow advised Nordby that a caseload reduction was not a reasonable accommodation.  (*See* March 21st Mtg.)  She further advised that Nordby was not where Sherburne expected her to be at that point in her probationary period, and that Nordby "had to try" to be successful because others were "putting hours and hours of extra work in to help [her]." (*Id.*)  According to Bigelow's documentation, Nordby asserted that she had said during her interview that she expected it would take her a year to get trained.[22]  (*See id.*)

On March 26, 2019, Bigelow sent Nordby a letter summarizing their meeting on March 21, 2019.  (Kjellberg-Nelson Aff. ¶ 34, Ex. GG ("Summary").)  The Summary reiterated Sherburne's position that a reduced caseload was not a reasonable accommodation.  (*Id.*)  It also listed accommodations that had been put in place including:  (1) relocation to a quieter cube; (2) temporary case reduction; (3) use of an interview room to complete phone interviews and return phone calls; (4) change in Lead

---

[21]    Scharber and Sue Koch, Nordby's union representative, also attended the meeting. (*See* March 21st Mtg.)

[22]    After the meeting, Bigelow forwarded her notes to Cobb, Holker, Larson, and Scharber.  (*See* March 21st Mtg. Notes.)

Worker; (5) Lead Workers "catching up" Nordby's work; (6) multiple resources and checklists; (7) a spreadsheet with specific actions to take on each case; and (8) education and training on persons who stutter for supervisors and co-workers.  (*See id.*)  The Summary concluded, "[t]he County has tried multiple accommodations, but you have stated that none are helpful.  Please contact me if you have other ideas for an accommodation, or if there are changes to current accommodations that would help you to be successful performing all essential functions [sic] your position."[23]  (*Id.*)

Sherburne terminated Nordby's employment on April 2, 2019, approximately 7 months after she started.  (*See* Kjellberg-Nelson Aff. ¶ 36, Ex. II ("Termination Notice").)  Nordby's Termination Notice stated, "[t]he reason for your termination is that your work performance does not meet expectations," and listed the following concerns:

- You consistently do not meet required timelines despite a reduced caseload.

- Ongoing need for additional Supervisor oversight and Lead Worker assistance beyond what is normal this far into the probationary period.

- Ongoing concerns regarding following County policy, procedures, and work production.

- Accuracy of your casework is considerably lower than required.

- Ongoing concerns regarding your initiative, accountability, and an overall negative attitude.

---

[23]   On the same day, Holker, Bigelow, and Cobb met to discuss Nordby's performance.  (*See* Kjellberg-Nelson Aff. ¶ 35, Ex. HH.)  Holker shared documentation reflecting errors, time management concerns, and lack of motivation since March 13, 2019.  (*Id.*)

(Termination Notice.)  Nordby contends that she was actually fired because of her stutter and her requests for accommodations.  (*See generally* Pl. Opp.)

Nordby filed the instant lawsuit on October 24, 2019.  (*See* Compl.)  She alleges both federal and state law claims including discrimination on the basis of disability (Counts I-II) and retaliation in response to her request for accommodations (Counts III-IV) in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§363A.01.

## DISCUSSION

### I.  Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v.*

*Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment "may not rest upon mere allegation or denials

of his pleading but must set forth specific facts showing that there is a genuine issue for

trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Disability Discrimination (Counts I and II)

Nordby alleges that Sherburne discriminated against her because of her stutter.

(Compl. ¶¶ 73-106.)  The ADA and MHRA prohibit employers from discriminating

against employees based on disability.[24]  42 U.S.C. § 12112(a); Minn. Stat. § 363A.08,

subd. 2.  Moreover, under both the ADA and MHRA, an employer must reasonably

accommodate an employee's disability unless it can demonstrate that the accommodation

would pose an undue hardship on the employer.  *See* 42 U.S.C. § 12112(b)(5)(A); Minn.

Stat.  § 363A.08, subd. 6.  An employer's failure to make a reasonable accommodation is

prohibited discrimination under both the ADA, *Peebles v. Potter,* 354 F.3d 761, 765 (8th

Cir. 2004), and the MHRA, Minn. Stat. § 363A.10, subd. 1.

Claims under the ADA and MHRA are analyzed under the *McDonnell Douglas*

burden-shifting analysis.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);

*Burchett v. Target Corp.*, 340 F.3d 510, 516 (8th Cir. 2003); *see also Dovenmuehler v.*

*St. Cloud Hosp.*, 509 F.3d 435, 439 & n.4 (8th Cir. 2007) (holding that federal precedent

may be used to construe both ADA and MHRA claims).  Under this framework, the

---

[24]     Courts consider claims of disability discrimination under the ADA and MHRA
simultaneously.  *See McCracken v. Carleton College*, 969 F. Supp. 2d 1118, 1129-30 (D.
Minn. 2013).

employee bears the initial burden of proving a prima facie case of discrimination.

*McDonnell Douglas Corp.*, 411 U.S. at 802.  The burden then shifts to the employer to

articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*

at 802-03.  Finally, to prevail, plaintiff must show that the defendant's proffered reason

was a pretext for discrimination.  *Id.* at 804.

To establish a prima facie case of disability discrimination, a plaintiff must show

that:  (1) she was disabled; (2) she was qualified to perform the essential functions of the

job, with or without reasonable accommodation; and (3) she suffered an adverse

employment action as a result of the disability (or under circumstances from which an

inference of unlawful discrimination arises).  *See Kallail v. Alliant Energy Corp. Servs.,*

*Inc.*, 691 F.3d 925, 930 (8th Cir. 2012).  The burden-shifting analysis is "modified" for a

failure to provide reasonable accommodate claim.  *See Peebles v. Potter*, 354 F.3d 761,

765-68 (8th Cir. 2004); *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th

Cir. 2003).[25]  To establish a claim of failure to provide reasonable accommodation,

Nordby must first make a facial showing that a reasonable accommodation is possible

and, if she makes that showing, the burden of production then shifts to the employer to

show that it was unable to accommodate Nordby.  *See Fenney*, 327 F.3d at 712;

*Liljedahl v. Ryder Student Transp. Servs., Inc.*, 341 F.3d 836, 842 (8th Cir. 2003).

---

[25]     This is because a failure to accommodate claim does not turn on an employer's
intent or motive.  *Peebles*, 354 F.3d at 765-68.

For purposes of the present motion, Nordby claims that she was terminated by Sherburne because of her disability and that Sherburne discriminated against her by failing to make a reasonable accommodation and failing to engage in the interactive process. Sherburne disputes both that Nordby has a disability within the meaning of the ADA and that she is a "qualified individual." Moreover, Sherburne contends that Nordby was terminated for poor performance and that the accommodation she requested was unreasonable. Sherburne argues that Nordby's discrimination claims fail as a matter of law.

### A.   Disability Discrimination

#### 1.   Disability

Sherburne contends that the first element of Nordby's prima facie case fails because she cannot show that she has a disability that substantially limits her ability to communicate when she has been able to attend school and perform other jobs. (Def. Memo. at 21-22; *see also* Reply at 1-2.) Sherburne asserts that "other than taking her longer to speak, [Nordby's] stutter actually does not limit her life in any way, and she has been able to accomplish many things, including starting her own business." (Reply at 1; *see also* Def. Memo. at 22.) Accordingly, Sherburne argues that Nordby "fails to provide evidence from which a reasonable jury could find more than a mere difference in her speech compared to others." (Def. Memo. at 23.) The Court disagrees.

The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.

§ 12102(1).[26] "This threshold inquiry requires an individualized analysis of the effects of the claimed impairment on the individual's life activities." *Heisler v. Metro. Council*, 339 F.3d 622, 627 (8th Cir. 2003) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483 (1999)).

An impairment is substantially limiting if it renders a person unable to perform a major life activity that the average person in the general population can perform. 29 C.F.R. § 1630.2(j)(1)(ii) (2012). *See also Heisler*, 339 F.3d at 627, *Cooper v. Olin Corp., Winchester Div.,* 246 F.3d 1083, 1088 (8th Cir.2001). The impairment need not prevent or severely restrict the individual from performing a major life activity in order to be considered substantially limiting; however, not every impairment will constitute a disability. 29 C.F.R. § 1630.2(j)(1)(ii) (2012).

Major life activities include functions such as caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working. 29 C.F.R. § 1630.2(i) (2012). The Supreme Court has instructed that courts analyze only those major life activities which the plaintiff asserts are limited by the claimed impairment. *See Bragdon v. Abbott,* 524 U.S. 624, 638 (1998).

---

[26]    The applicable definition under the MHRA defines an individual with a disability as "any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn. Stat. § 363A.03, subd. 12.

The Court finds that Nordby has presented sufficient evidence to create a genuine issue of fact as to whether her stuttering constitutes a "disability" under the ADA and MHRA.  There is no dispute that speaking is a major life activity.  Moreover, Nordby testified that her stutter has affected her ability to communicate her entire life and that she has at times taken prescribed medication to cope with anxiety and depression related to her stutter.[27]  (Nordby Dep. at 19-20, 251.)  Nordby also presented documentation from her Speech Pathologist that Nordby's stutter is "severe," "lifelong," and "greatly impacts her ability to communicate."  (Dauer Letter at 3.)

While a reasonable factfinder may ultimately conclude that Nordby is not substantially limited by her stutter, for the purposes of this motion, the Court construes the evidence in the light most favorable to Nordby and declines to dismiss her claims on this basis.

## 2.    Qualified Individual

Sherburne argues that the second element of Nordby's discrimination claims fails because she was not qualified to perform an essential function of her Position with or without reasonable accommodation.  (Def. Memo. at 23-26.)  Nordby claims that she was qualified to perform the Position with a temporary, reasonable accommodation that Sherburne improperly denied.  (*See generally* Pl. Opp.)

---

[27]    At one point during her employment with Sherburne, Nordby's anxiety was so great that she needed to stay home from work.  (*See* Medical Note.)

The ADA defines a qualified individual as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). When determining which job functions are essential, "consideration shall be given to the employer's judgment, " and "if an employer has prepared a written job description . . . this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Other considerations include "[t]he amount of time spent on the job performing the function" and "[t]he consequences of not requiring the incumbent to perform the function." 29 C.F.R. § 1630.2(n)(3).

Reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9).

Sherburne first contends that carrying a full caseload is an essential function of the Position. It contends that while the Job Description does not specifically identify carrying a full caseload as an essential function, "it is axiomatic that a full caseload would be required." (*Id.* at 25.) Sherburne further argues that the consequence of not carrying a full caseload is that others have to assume the work. (*Id.*)

Sherburne relies heavily on *Hill v. Walker*, 737 F.3d 1209, 1216-19 (8th Cir. 2013) to support its argument. (Def. Memo. at 24-25.) In *Hill*, the Eighth Circuit found that a family service caseworker who suffered from anxiety and depression was not a qualified

individual under the ADA when the only accommodation she would accept was to be removed from a particularly stressful case.[28]  737 F.3d at 1217-18.  The Eighth Circuit observed that handling stressful cases was an essential function of the job in part because "[t]he ability of individual caseworkers to pick and choose among case assignments based on their toleration of stress could wreak havoc with management of the agency." (*Id.* at 1218.)  The Eighth Circuit further noted that because removing plaintiff from a particular case would have required assumption of that function by another worker, removal was not a reasonable accommodation and plaintiff was therefore unqualified to perform an essential function of her job when she refused alternative accommodations. (*Id.* at 1217.)  Sherburne contends that just as the caseworker in *Hill* could not opt out of handling one case, Nordby "should not be able to opt out of handling half a caseload, particularly where other workers must assume responsibility for those cases."  (Def. Memo. at 25.)

The Court agrees that a permanent caseload reduction may indeed wreak havoc on Sherburne's long-term ability to function.  Here, though, Nordby was terminated during a probationary period in which new hires routinely did not carry full caseloads, and the parties dispute whether Nordby's request for a caseload reduction was permanent or temporary.  (*See* Pl. Memo. at 39-40.)  Accordingly, the Court finds that Nordby has

---

[28]     In *Hill*, the plaintiff's written job description indicated that the position would include frequent exposure to abuse and a stressful environment.  *Hill*, 737 F.3d at 1217.

presented sufficient evidence to create a triable issue of fact as to whether she was qualified for the Position.

First, the Court cannot conclude as a matter of law that carrying a full caseload was an essential function of the Position, particularly in the first year, during which all new hires are subject to a probationary period and are expected to gradually increase the size of their caseloads.  Unlike *Hill,* the alleged essential function was routinely overlooked during the first year.  Because neither the Job Description nor Sherburne's own actions conveyed an expectation that employees carry a full caseload during the first year, the Court cannot conclude as a matter of law that doing so was an essential function.

Similarly, the Court cannot conclude from the record whether Nordby's request for a reduced caseload was for a permanent or temporary reduction.  While Bigelow testified to her belief that Nordby's request was for a permanent reduction (Bigelow Dep. at 37-38), Sanders testified that she understood Nordby's request to be for a temporary reduction (Sanders Dep. at 20-21).  Nordby argues vehemently that her request was for a temporary reduction, and that she advised Sherburne multiple times, even during her interviews, that she anticipated it would take her a year to get up to speed because of her stutter.  In short, the Court finds sufficient evidence to create a genuine dispute of material fact over whether Nordby requested a permanent or temporary caseload reduction.

The analysis next turns on whether Nordby would have been qualified for the Position with a temporary caseload reduction and whether that request was reasonable.

23

As discussed above, the Court cannot conclude as a matter of law that maintaining a full caseload was an essential function of Nordby's Position. For this reason alone, the Court finds sufficient evidence to create a triable issue of fact of whether Nordby was qualified for the Position despite being unable to carry a full caseload.

As set forth below, the Court also finds that Nordby presents sufficient evidence to create a triable issue over whether her request for a temporary caseload reduction was reasonable. Therefore, for the purposes of this motion, the Court cannot conclude as a matter of law that Nordby was not qualified for the Position.

### 3.     Causation and Pretext

The parties do not appear to dispute that Nordby suffered an adverse employment action when she was terminated. Instead, Sherburne argues that Nordby was lawfully terminated for poor performance. Nordby relies on the temporal proximity between when she requested accommodations and her termination to argue that Sherburne's stated reasons for her termination was pretext for discrimination. She also contends that there is sufficient record evidence that Sherburne harbored animosity towards her based on her disability to create a triable issue on whether that was true reason for her termination. The Court agrees.

While Sherburne may ultimately prevail, for the purposes of this motion, the Court finds that Nordby has at least presented sufficient evidence to defeat summary judgment. For example, the Court cannot conclude as a matter of law that Nordby was terminated solely for performance issues when an email exists from the head of Nordby's division to Nordby's supervisors lamenting that it would take "longer than either of [them] would

24

like" to "take action" after receiving Dauer's recommendations.[29]  (*See* Cobb Email.)
The Court declines to speculate exactly what the Cobb Email shows; however, a
reasonable factfinder could construe it as discriminatory animus based on Nordby's
disability or her request for accommodations.  The Court also cannot resolve the parties'
dispute over whether Holker told Nordby to stay home if she was having a "severe
stuttering day," (*see* Pl. Opp. at 38; *see also* Nordby Dep. at 113, 115) or whether Holker
made other derogatory comments about Nordby's stutter (*see, e.g.*, Bigelow Notes;
Bigelow Follow-Up).  While temporal proximity alone often cannot support a causal link,
here, there is other evidence that could lead a reasonable factfinder to conclude that
Nordby's termination was causally linked to her disability.  *E.E.O.C. v. Prod.
Fabricators, Inc.,* 763 F.3d 963, 973 (8th Cir. 2014) (recognizing that "there is no
definitive line drawn to show at what point a temporal connection establishes causation,"
but noting that other evidence may support a connection over a longer timeframe).

The Court recognizes that it is a close call; however, viewing the evidence in the
light most favorable to Nordby, as it must, the Court finds that she has presented
sufficient evidence for a reasonable factfinder to conclude that Sherburne's stated reasons
for her termination were pretext for discrimination.  Accordingly, the Court declines to
grant summary judgment on Nordby's discrimination claims.

---

[29]     The Cobb Email also cites Nordby's alleged "lack of effort" which, in the context
of her disability, could be construed as animosity towards something she could not
control.

**B.     Failure to Accommodate**

Whether or not Nordby was qualified for the Position hinges on whether her request for reduced caseload was a possible reasonable accommodation.  Accordingly, the Court now engages in this secondary analysis, simultaneously supporting its earlier finding and addressing Nordby's second theory of discrimination.

To establish discrimination based on a failure to accommodate, Nordby must make a facial showing that a reasonable accommodation was possible.  *See Fenney*, 327 F.3d at 712.  As discussed above, the parties dispute whether Nordby's request for a caseload reduction was temporary or permanent.  Construing the evidence in favor of Nordby and assuming that her request was for a temporary caseload reduction, the Court finds sufficient record evidence to support at least a facial showing that a reduced caseload was a possible reasonable accommodation.  This is particularly true given that Sherburne actually did reduce Nordby's caseload for a period of time, and because it routinely allowed new hires to carry reduced caseloads during their probationary periods.

Having made a facial showing that a reasonable accommodation was possible, the burden of production shifts to Sherburne to show that it was unable to accommodate Nordby.  "[I]f a requested accommodation is unreasonable, then the employee has not shown 'discrimination.'"  *Peebles,* 354 F.3d at 767 n.6.  Even assuming that Nordby's request for a caseload reduction was temporary, Sherburne argues that it was unreasonable because it would have required others to do her work and it would not have

improved Nordby's poor performance.[30]  Sherburne contends that it is "complete

speculation that at the end of the year, [Nordby] would have been fully capable of

carrying a full caseload." (Reply at 3.)  Again, construing the evidence in the light most

favorable to Nordby, the Court finds sufficient evidence for a reasonable factfinder to

conclude that a temporary caseload reduction was reasonable.

Indeed, based on the nature of Nordby's disability and her prior experience at

Chisago County, a reasonable factfinder could conclude that a reduced caseload for a

period of 5 months may have yielded sufficient time for Nordby to become confident in

the Position and enabled her to handle a full caseload.  The record clearly reflects that

Dauer recommended a significant amount of "extra time" for Nordby to do her work.

Moreover, while Nordby's performance was poor, the record reflects that she started with

a larger than average caseload and was required to participate in extra meetings and

complete additional performance activities that may have taxed an employee not already

struggling.  Finally, any argument that a temporary caseload reduction was unreasonable

or impossible is weakened by the fact that new hires were not expected to carry full

caseloads during the probationary period.  Here, unlike in *Hill*, the requested

accommodation was built into the onboarding process.  *See Hill*, 737 F.3d at 1217-18.  In

---

[30]     Sherburne relies again on *Hill v. Walker* to support its position that a caseload
reduction was an unreasonable accommodation.  737 F.3d at 1217-18.

short, the Court cannot conclude that Nordby's theory of discrimination based on failure

to accommodate fails as a matter of law.[31]

## III.   Retaliation (Counts III and V)

Nordby also alleges that she was subjected to numerous adverse employment

actions because of her accommodation requests, "as a result of her disability and for

otherwise engaging in statutorily protected activity."  (Compl. ¶¶ 110 & 121.)

A good faith request for a reasonable accommodation constitutes protected activity

to support a retaliation claim under the ADA and MHRA.  *See Kirkeberg v. Canadian*

*Pac. Ry.*, 619 F.3d 898, 907-08 (8th Cir. 2010) (following *Heisler*, 339 F.3d 622 at 632;

*see also Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001)

("[W]hen the employee specifically ties a request for work assistance to a disability, the

employee engages in protected activity under the MHRA.").  Filing a charge of

discrimination is also plainly protected activity.  *See* 42 U.S.C. § 12203(a); Minn.

Stat. § 363A.15.  In addition, making a report of alleged discrimination to a supervisor

may also qualify as protected.  *See Helton v. Southland Racing Corp.*, 600 F.3d 954, 961

(8th Cir. 2010); *see also Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011) (citing

*Helton* and holding that "[plaintiff's] filing of [an] internal discrimination complaint

qualifies as protected conduct").  Retaliation laws are designed to "protect[] an individual

---

[31]    Because the Court already finds sufficient evidence to deny Sherburne's Motion
with respect to Nordby's disability claims, it need not address whether Sherburne
participated in the interactive process in good faith.  "There is no per se liability under the
ADA if an employer fails to engage in an interactive process."  *Cravens v. Blue Cross &
Blue Shield*, 214 F.3d 1011, 1019 (8th Cir. 2000).

not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

The Court analyzes Nordby's retaliation claim under the *McDonnell Douglas* framework. *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042-43 (8th Cir. 2007). Accordingly, the initial burden is on Nordby to establish a prima facie case, consisting of evidence: (1) she engaged in statutorily protected activity; (2) an adverse employment action was taken; and (3) a causal connection exists between the two events. *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006). If Nordby establishes a prima facie case, the burden then shifts to Sherburne to show a non-retaliatory reason for its adverse employment action, at which point the burden returns to Nordby who must present evidence that creates both: (1) a question of fact as to whether Sherburne's reason was pretextual; and (2) a reasonable inference that Sherburne acted in retaliation. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005) (citation omitted).

Sherburne argues that Nordby's claims fail because the only protected activity she engaged in was her request for accommodations and she cannot show a causal connection between that request and her termination. Moreover, Sherburne asserts that it lawfully terminated Nordby for performance reasons, and that aside from the temporal proximity between her request for accommodations and termination, Nordby offers no evidence that retaliation was the true motive for her termination. Sherburne further argues that timing alone is insufficient to create a triable issue of fact, particularly when Nordby's

performance issues arose before her request for accommodations and when Sherburne granted all but one of her requested accommodations.

The Court cannot conclude as a matter of law that Nordby's retaliation claim fails. Sherburne does not appear to dispute that Nordby's request for accommodations was protected activity.[32]  The parties also do not appear to dispute that Nordby's termination satisfies the second element of her prima facie case.  Further, as discussed above, the Court finds sufficient record evidence to create a triable issue on the causal link between Nordby's termination and her request for accommodations.  Here, the evidence is particularly compelling when Nordby's request for accommodations occurred simultaneously with her report that Holker did not understand her disability and when Nordby reported Holker a second time in late February.  The parties dispute what Holker knew and when she knew it; however, the Cobb Email creates a question of fact as to whether Sherburne's stated reasons for terminating Nordby were pretextual and creates a reasonable inference that Sherburne acted in retaliation.  The Court reiterates that while Nordby has produced enough evidence to defeat summary judgment, a reasonable factfinder may ultimately conclude that her retaliation claim fails.

---

[32]    Nordby has also presented evidence that she reported Holker for alleged discrimination more than once.  (*See* Nordby Email 1; Nordby Email 2; Bigelow Notes; *see also* Nordby Dep. at 157, 160-61, Scharber Notes.)  "Filing [an] internal discrimination complaint qualifies as protected conduct."  *Pye v. Nu Aire, Inc.*, 641 F.3d at 1020.  Nordby met with Human Resources regarding the second report on February 21, 2019 (*see* Scharber Notes), approximately two weeks before the Cobb Email (*see* Cobb Email) and 90 days before she was terminated (*see* Termination Notice).

## CONCLUSION

For the reasons set forth above, the Court finds that Nordby has presented sufficient evidence to create triable issues on whether Sherburne discriminated against her because of her stutter and whether Sherburne retaliated against her for engaging in protected activity.  Therefore, the Court denies Sherburne's motion for summary judgment.

The Court observes that while Nordby has presented sufficient evidence to defeat summary judgment, her burden at trial will be much higher.  Moreover, the Court fails to see how continued litigation benefits either party and strongly encourages a settlement.[33]

## ORDER

Based upon the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. [24]) is **DENIED**.

Dated:  April 23, 2021                                          s/Donovan W. Frank
                                                                DONOVAN W. FRANK
                                                                United States District Judge

---

[33]     If the parties would like the Court's assistance in pursuing a settlement, they may contact chambers and the Court will help coordinate priority scheduling of a settlement conference with the Magistrate Judge.